# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MOON EXPRESS, INC., )
)
    Plaintiff, )
)
    v. ) Civil Action No. 16-344-LPS-CJB
)
)
INTUITIVE MACHINES, LLC, )
)
    Defendant. )

## REPORT AND RECOMMENDATION

Plaintiff, Moon Express, Inc. ("Plaintiff" or "Moon Express") filed suit in May 2016

against Defendant Intuitive Machines, LLC ("Defendant" or "IM"), seeking various forms of

relief arising out of a series of contract disputes. (D.I. 2) In its now-operative First Amended

Complaint ("FAC"), plaintiff alleges breach of contract (Count I), breach of the covenant of

good faith and fair dealing (Count II), unjust enrichment (Count III), misappropriation of trade

secrets under the federal Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.* (Count IV),

misappropriation of trade secrets under the Delaware Uniform Trade Secrets Act ("DUTSA"),

6 Del. Code § 2001 *et seq.* (Count V), and conversion (Count VI), and it seeks injunctive relief

(Count VII) and a declaratory judgment (Count VIII). (D.I. 19) Before the Court is Defendant's

motion to dismiss Counts II, III, IV, V, VI and VII—that is, every count except for the breach of

contract claim in Count I and the request for a declaratory judgment in Count VIII—filed

pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (D.I. 21).

For the reasons that follow, the Court recommends that Defendant's motion be

GRANTED-IN-PART and DENIED-IN-PART.[1]

---

[1]     The Court does not address herein Defendant's Motion as it relates to the trade secret misappropriation claims (Counts IV and V). The Court will seek a report from the parties as to the status of those claims, including an update as to whether Plaintiff intends to further

## I.    BACKGROUND[2]

### A.    The Parties

Plaintiff is incorporated in Delaware, and has its principal place of business in Cape Canaveral, Florida. (D.I. 19 at ¶ 11) Plaintiff is "in the business of designing and manufacturing spacecraft, and seeks to become the first private company to land an unmanned probe on the Moon, with a continuing commercial robotic lunar transportation business including the return of materials to Earth." (*Id.* at ¶ 15) In July 2016, "Plaintiff received regulatory approval from the Federal Aviation Administration to become the first commercial entity in U.S. history to send a robotic [lunar] lander to the moon." (*Id.* at ¶ 16)

Defendant is a limited liability company organized under the laws of Texas and with a principal place of business in Houston, Texas. (*Id.* at ¶ 12) "Defendant is in the business of designing, testing and manufacturing spacecraft components and developing software for controlling the flight of spacecraft." (*Id.* at ¶ 17)

### B.    The Contracts and Alleged Violations of the Contracts

Plaintiff's claims arise from two contracts between Plaintiff and Defendant. (*Id.* at ¶ 2) First, on or about April 1, 2015, according to Plaintiff, the parties entered into an agreement (the "Flight Software Contract" or "FSC"), in which Defendant would develop and deliver flight software for Plaintiff's spacecraft and lunar lander systems. (*Id.* at ¶¶ 18–19) Second, beginning in or around January 2015, "the parties entered into negotiations and preliminary documents for

---

pursue the claims in this case.

[2]     In its brief, Defendant explains that it "has assumed that the facts pled [in the FAC] that are not contradicted by the express terms of the [TRV] contract are true." (D.I. 22 at 4 n.5) However, Defendant does not thereafter specifically identify which facts in the FAC are said to contradict the express terms of the TRV Contract.

the sale of Defendant's core space-related business (as well as the transfer of key personnel) to

Plaintiff, including but not limited to its [terrestrial return vehicle (or "TRV")] business." (*Id.* at

¶ 30) These negotiations culminated in the execution of a "Master Purchase, Development, and

Manufacturing Agreement" (the "TRV Contract"), which the parties signed on October 6, 2015.

(*Id.* (internal quotation marks omitted))

### 1. Flight Software Contract

The FSC is not a single, unitary written contract. Instead, according to Plaintiff, it is

"reflected in a series of documents and communications in which the parties agreed (1) that

Defendant would develop and deliver certain flight software for Moon Express spacecraft and

[lunar] lander systems, and (2) that Plaintiff would make a series of payments to Defendant in

accordance with a specified schedule, against achievement by Defendant of certain specified

performance milestones." (*Id.* at ¶ 19) The FSC contemplated "three 'phases' of software

development and delivery, *i.e.*, Phase A, Phase B and Phase C."[3] (*Id.* at ¶ 20) For example, "the

completion of Phase A was to be 'Test FSW Flying Tethered on [Beaglebone Black] Processor,'

i.e., the successful testing of the subject Flight Software on Plaintiff's prototype lunar lander,

using the software in the hardware of Plaintiff's [Beaglebone Black]-based avionics system on

board its prototype lander, while the lander was flying tethered on Earth." (*Id.* at ¶¶ 21–23 &

n.2)

According to the FAC, "Defendant has not delivered software capable of performing the

testing required to complete Phase A." (*Id.* at ¶ 24) Meanwhile, "[i]n accordance with the terms

---

[3]      In its Answer, Defendant admits that the FSC "is reflected in a series of
documents and communications[]" and that "it contemplated three phases of software
development and delivery[,]" but Defendant "denie[s] that the documents referred to by
[Plaintiff] constitute that contract[.]" (D.I. 23 at 2–3 at ¶¶ 19–20)

3

of the Flight Software Contract, Plaintiff paid Defendant $1,125,000 in cash at the beginning of

Phase A, on or about May 20, 2015, and undertook an obligation to make a series of payments to

Defendant, against achievement by Defendant of certain specified performance milestones." (*Id.*

at ¶ 25) Plaintiff contends that it "is in compliance" with its obligations under the FSC and "has

not been obligated to make additional payments to Defendant because Defendant has not

delivered the required software" or completed Phase A of the contract. (*Id.* at ¶ 26) Moreover,

Defendant did not "transfer possession to Plaintiff of . . . [various] Phase A 'deliverables' and

related integration support[,]" which it was obligated to do under the FSC. (*Id.* at ¶¶ 27–28)

### 2. TRV Contract[4]

In the TRV Contract, "the parties agreed (1) that Defendant would design, develop, test

and manufacture a demonstrator TRV vehicle, including a successful flight to and from the

International Space Station . . . , (2) that Defendant would transfer and convey, unencumbered,

specified intellectual property to Plaintiff, and (3) that Plaintiff would make a series of payments

to Defendant, against achievement by Defendant of certain specified performance milestones."

(*Id.* at ¶ 31) The TRV Contract identified three types of intellectual property. First, Defendant

granted Plaintiff a license related to "Background IP Assets [in existence at the time of the

contract and] embodied in the TRV, as an integrated vehicle and including a separate use of

subsystems and components in the field of space exploration" (the "Background IP" or

---

[4]    Defendant points out that Plaintiff did not attach the TRV Contract to the FAC; nevertheless, it notes that the Court may consider the content of the TRV Contract without treating this motion as a motion for summary judgment under Federal Rule of Civil Procedure 56, "[b]ecause [Plaintiff] repeatedly relie[d] on the TRV Contract throughout [the FAC]." (D.I. 22 at 3 & n.3) The Court agrees. *See In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Defendant has supplied a copy of the TRV Contract as an exhibit to its brief, and the Court will cite to the contract at times herein. (D.I. 22, ex. A)

4

"Background IP Assets"). (D.I. 22, ex. A at § 3.1) Second, Plaintiff granted Defendant a

forward license to "the IP Assets [to be developed by Defendant under the TRV Contract]

embodied in the TRV for use with subsystems and components" (the "IP Assets"). (*Id.*) And

third, the parties amended the TRV Contract in January 2016 to clarify Defendant's license to

Plaintiff of what the parties called "Special Intellectual Property" (the "Special IP"), which they

defined as "the software development environment required to simulate the TRV vehicle in its

environment and perform the [International Space Station] payload return mission. This

includes test cases and test data for comparison, build and configuration files, and [Defendant-

]developed TRV simulation source code and documentation[.]" (*Id.*, amend. 1 at 1)

Under the TRV Contract, "Plaintiff [] made a series of payments to Defendant in the total

amount of $2,092,598" and asserts that it "complied with all of its contractual obligations." (D.I.

19 at ¶ 33) However, Plaintiff identifies a number of ways in which Defendant "has breached its

contractual obligations under the TRV Contract[,]" (*id.* at ¶ 34), as set out further below.

### a.    Background IP Assets and IP Assets

According to Plaintiff, "Defendant was required to convey to Plaintiff all Background IP

Assets and IP Assets . . . within 7 days of signing the TRV Contract, i.e., by October 13, 2015."

(*Id.* at (a)) As of the date of filing the FAC, however, Plaintiff had "received only a small

portion of the Background IP Assets and IP Assets . . . [and] some of [the intellectual property]

ha[s] not been 'unencumbered' as required." (*Id.*)

### b.    Developed IP Assets

Under the TRV Contract, Defendant is "required to deliver to Plaintiff all IP Assets as

soon as they were developed by Defendant, including all manufacturing, assembly and test

documentation generated in the course of the 'Development Services' specified in Schedule 1 to

5

the TRV Contract." (*Id.* at (b)) "The 'Developed IP Assets' include, but are not limited to, all of the documentation listed in Schedule 2 to the TRV Contract." (*Id.*) Plaintiff asserted that as of the date of the FAC, "Defendant has failed to deliver any useful hardware or software of the Developed IP Assets to Plaintiff, and has failed to meet contractual IP transfers as they became due." (*Id.*) "On December 8, 2015, Plaintiff delivered to Defendant a Notice of Non-Compliance listing the contractual failures and IP outstanding, and requesting remedy." (*Id.*)

### c.      Transfer of CASIS Agreement

The Center for Advancement of Science in Space (or "CASIS") is a third-party provider of payload transportation to the International Space Station (hereinafter, "ISS"). (*Id.* at (c)) Defendant had a TRV Flight Agreement (the "TRV Flight Agreement") with CASIS that, under the TRV Contract, Defendant was to "transfer and assign to Plaintiff[.]" (*Id.*) The TRV Contract obligated Defendant to "take 'all reasonable actions to ensure that CASIS agrees to said transfer.'" (*Id.*)

Instead, at some time around June 2016, it is alleged that "Defendant cancelled its 'TRV Flight Agreement' with CASIS" and told CASIS representatives "that the TRV development ha[d] ceased and the [TRV] w[ould] not be ready for the scheduled flight[.]" (*Id.*) Moreover, Plaintiff alleges that Defendant "discourag[ed] CASIS from agreeing to the transfer of the TRV Flight Agreement to Plaintiff." (*Id.*) As a result, CASIS "cancel[led] all flight plans for the TRV[.]" (*Id.*)

### d.      Monthly Program Review Meetings and Delivery of IP

Plaintiff alleges that under the TRV Contract, Defendant was obligated to provide Plaintiff with "project status updates at monthly program review meetings," and to provide "technical and schedule data," "TRV documentation," and "all designs, software, test results and

other relevant materials as requested by Plaintiff." (*Id.* at (d))  According to Plaintiff, Defendant

has failed to provide such information and intellectual property as required, in that Defendant

"has failed to transfer the majority of the current and substantive TRV development information

and intellectual property to Plaintiff that Plaintiff paid to receive." (*Id.*)

### e.      Marketing and Vehicle Markings

"Under the TRV Contract, any TRVs and related packaging or marketing materials are

required to be marked exclusively with Plaintiff's trademarks and logos." (*Id.* at (e))  Plaintiff

alleges that, after signing the TRV Contract, Defendant marketed the TRV on its website as its

"own product," published a "branded video" of TRV drop tests on its website, sponsored "a

TRV software design contest with a local university," and "display[ed] Defendant's logos on test

vehicles during drop tests being filmed by The Discovery Channel." (*Id.*)

### f.      Withholding of Payments and Work Stoppage

Plaintiff's FAC goes on to further identify numerous failures by Defendant to deliver

certain documentation and intellectual property assets under the TRV Contract.  (*Id.* at ¶¶ 34–43)

Plaintiff describes how, due to certain of these failures, it withheld "payments for Defendant's

November 2015 invoice of $241,000 and subsequent invoices." (*Id.* at ¶ 35)  "In January, 2016,

Plaintiff made a good faith payment of Defendant's November [2015] invoice[,]" (*id.*), and "[o]n

January 8, 2016 Plaintiff released a payment to Defendant in good faith for the period . . . ending

on Dec[ember] 19, 2015, following Defendant's written acknowledgment that certain critical

Background IP Assets due from Defendant under the TRV Contract w[ere] indeed still owed to

Plaintiff. . . . [and] in anticipation of a TRV Contract amendment [for Special IP] that was

executed on January 18, 2016[.]" (*Id.* at ¶ 36, 44)

Nevertheless, Plaintiff contends, on "February 6, 2016, . . . Defendant notified Plaintiff

that Defendant had decided to stop work on the TRV Contract and Phase A of the Flight

Software Contract[]" for lack of payment for the two periods from December 20, 2015 through

February 19, 2015. (*Id.* at ¶ 45) Moreover, Plaintiff alleges, "[c]ertain "Special [] IP" delivered

by Defendant to Plaintiff on or about January 20, 2016, contained unworkable instructions with

errors that Defendant has acknowledged[,]" and "Plaintiff . . . invest[ed] its own time and

resources . . . correcting the errors." (*Id.* at ¶ 47)

### g. Disparagement

Plaintiff also alleges that Defendant has breached the TRV Contract by making certain

disparaging statements about Plaintiff to the National Aeronautics and Space Administration

("NASA") and to CASIS, including: (1) "inform[ing] NASA personnel of its stop work decision

with respect to the TRV Contract[,]" (2) discussing the present dispute with NASA personnel,

specifically "that each side has 'lawyered up[,]'" and (3) informing NASA and CASIS

employees "that it disputes Plaintiff's rights to the TRV." (*Id.* at ¶ 49) Plaintiff also avers that

Defendant's cancelling of its "'TRV Flight Agreement' with CASIS" is disparaging to Plaintiff,

because "CASIS was and is aware that Plaintiff was going to be the end-user of the 'TRV Flight

Agreement.'" (*Id.*) Plaintiff also contends that "Defendant has continued to represent the TRV

and return vehicle business as its own in sales solicitations to customers, proposals to NASA,

and on its website[.]" (*Id.* at ¶¶ 79, 90)

### C. Confidential Information

As it relates to both contracts, Plaintiff alleges that Defendant has disclosed and

misappropriated confidential information in several ways.

First, "Defendant has integrated elements of the IP Assets, developmental Flight

Software and associated products and services owned by Plaintiff into its products and business

operations. . . . [and] has treated such improvements as its own and used them to enrich other business areas that Defendant is pursuing." (*Id.* at ¶ 79)

Second, in addition to incorporating Plaintiff's intellectual property into its current product development, Plaintiff contends that Defendant "has embedded Plaintiff's IP into . . . proposals to third parties in competition with Plaintiff." (*Id.*) This includes disclosures to Axiom Space LLC ("Axiom Space"), which is "a division of Defendant's parent company." (*Id.*; *see also id.* at ¶ 49(e)) For example, according to Plaintiff, its "IP [was disclosed to Axiom Space and incorporated] . . . into business plans for commercial orbital services offered by Axiom Space[.]" (*Id.* at ¶ 79)

Third, Plaintiff contends that "Defendant disclosed critical portions of the IP Assets and TRV software and operational designs to Rice University students who were competing in a challenge sponsored by Defendant to develop a mobile app that would allow people to track [the] TRV" while in flight. (*Id.* at ¶ 80 (internal quotation marks omitted))

### D.     Procedural Background Relevant to the Motion

As noted above, with its Motion, Defendant seeks dismissal of Counts II through VII pursuant to Rule 12(b)(6). The Court herein will address that Motion as to all relevant Counts but Counts IV and V (regarding trade secret misappropriation). Defendant filed the Motion on August 31, 2016, (D.I. 21), and it was fully briefed as of October 10, 2016, when Plaintiff filed its answering brief, (D.I. 27).[5] Defendant then requested oral argument on the Motion. (D.I. 28)

On January 6, 2017, Chief Judge Leonard P. Stark ordered that the instant case be referred to the Court for all purposes, up to and including the resolution of case-dispositive

---

[5]     Defendant opted not to file a reply brief. (D.I. 28)

motions. (D.I. 39) The Court heard oral argument on the Motion on May 4, 2017. (D.I. 76, hereinafter "Tr.") Thereafter, the Court participated in mediation-related efforts with the parties, (D.I. 75), but the case has not resolved.

## II.    STANDARD OF REVIEW

Pursuant to Rule 12(b)(6), a party may move to dismiss a plaintiff's complaint based on the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2).

When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting "all of the complaint's well-pleaded facts as true, but [disregarding] any legal conclusions." *Id.* at 210–11. Second, the court determines "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In assessing the plausibility of a claim, the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

## III.   DISCUSSION

### A.   Defendant's Arguments

#### 1.   Factual Averments

In its brief, Defendant repeats "three basic factual averments" upon which, it contends, several of Plaintiff's claims in the FAC are based. (D.I. 22 at 2, 4–5, 9) Into these asserted "factual averments" of Plaintiff, Defendant insinuates its own arguments and defenses—namely that: (1) Plaintiff paid $3,217,598 in payments to Defendant pursuant to both contracts, which amounted to only partial payment under the two contracts, (2) Defendant "refused to deliver certain intellectual property . . . because [Plaintiff] failed to make payment under the terms of the Contracts[,]" and (3) Defendant "improperly used certain intellectual property . . . [but that, according to the TRV Contract, Defendant was] entitled to do [so.]" (*Id.* at 2, 5)

The way Defendant asserts these "facts," however, also has the effect of combining the two contracts into one with regard to Defendant's arguments for dismissal—when in fact each contract requires separate treatment when assessing each of the counts at issue. Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."), *United States v. Louisville & Nashville R.R. Co.*, 221 F.2d 698, 702 (6th Cir. 1955) (citations omitted) ("a complaint states different causes of action where it sets out and seeks to recover upon separate and distinct contracts."); *see also Minger v. Green*, 239 F.3d 793, 799 (6th Cir. 2001) ("the Rules require that we not rely solely on labels in a complaint, but that we probe deeper and examine the substance of the complaint"); *Taylor v. J.C. Penney Co., Inc.*, Case No. 16-cv-11797, 2017 WL 1908786, at *3 n.1 (E.D. Mich. May 10, 2017); *Int'l Bus. Machines Corp. v. Priceline Grp. Inc.*, Civil Action No. 15-137-LPS-CJB, 2017 WL 1349175, at *6–7 (D. Del. Apr. 10, 2017). Moreover, neither

party suggests that these two contracts should be read together. For these reasons, when addressing the counts below, the Court addresses the allegations regarding the FSC separately from the allegations regarding the TRV Contract.

### 2. Common Arguments

In support of its Motion, Defendant presents numerous, sometimes overlapping arguments. First, Defendant argues that the express contracts between the parties bar recovery under claims for, *inter alia*, breach of the covenant of good faith and fair dealing (Count II), unjust enrichment (Count III), and conversion (Count VI). (D.I. 22 at 8) Second, with respect to these claims, Defendant avers that Plaintiff has failed to plead all the elements of the claims. (*Id.* at 12–13 (Count VI), 15 (Count III) & 15–16 (Count II)) Third, Defendant avers that the claims for unjust enrichment (Count III) and conversion (Count VI) should be dismissed for the additional reason that these two claims are preempted by DUTSA. (*Id.* at 11, 14) And lastly, Defendant asserts that the count for injunctive relief (Count VII) is really no "count" at all. (*Id.* at 28) The Court will address Defendant's arguments as they relate to Count II first, followed by those as to Count III, Count VI and then Count VII.

### B. Breach of Covenant of Good Faith and Fair Dealing (Count II)

Defendant argues that Plaintiff's claim for breach of the covenant of good faith and fair dealing (Count II) should be dismissed, because recovery is barred by the express terms of the contracts and because Plaintiff did not plead all the elements of the claim. (*Id.* at 15–16) According to Defendant, the decision in *Khushaim v. Tullow Inc.*, C.A. No. N15C-11-212-PRW, 2016 WL 3594752, at *4 (Del. Super. Ct. June 27, 2016), is particularly instructive here, because "[l]ike *Khushaim*, [Plaintiff's] claim for breach of the covenant of good faith and fair dealing

relates directly to the express terms of the contracts." (D.I. 22 at 16)

### 1. Legal Standard

Pursuant to Delaware law, which applies here, "[t]he covenant [of good faith and fair dealing] is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (footnotes and internal quotation marks omitted). In order to successfully plead a breach of the implied covenant of good faith and fair dealing, "the plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Jeter v. RevolutionWear, Inc.*, C.A. No. 11706-VCG, 2016 WL 3947951, at *6 (Del. Ch. July 19, 2016) (footnote and internal quotation marks omitted).

Applying the covenant "involves a cautious enterprise," in which one "generally cannot base a claim for breach of the implied covenant on conduct authorized by [an] agreement." *Nemec v. Shrader*, 991 A.2d 1120, 1125–26 (Del. 2010) (citation and internal quotation marks omitted). To be sure, the Delaware Supreme Court "has recognized 'the occasional necessity' of implying contract terms to ensure the parties' 'reasonable expectations' are fulfilled." *Dunlap*, 878 A.2d at 442 (citation omitted). "This quasi-reformation, however, 'should be [a] rare and fact-intensive' exercise, governed solely by 'issues of compelling fairness.'" *Id.* (citation omitted); *see also Nemec*, 991 A.2d at 1126 ("We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected."). And "[o]nly when it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that

13

matter' may a party invoke the covenant's protections." *Dunlap*, 878 A.2d at 442 (citation omitted).

### 2. Discussion

#### a. Flight Software Contract

Although Defendant refers to both contracts in addressing this claim, Defendant presents no arguments as to why the express terms of the FSC preclude recovery under the breach of the covenant of good faith and fair dealing. (D.I. 22 at 16) And so, in response, Plaintiff did not discuss this issue either. (D.I. 27) For this reason, the Court recommends that the Motion—to the extent it relates to the allegations involving the FSC—be denied with regard to Count II.

#### b. TRV Contract

Plaintiff identifies "at least three instances of implied contractual obligations" relevant to the TRV Contract. (D.I. 27 at 15) These are: (1) an obligation to deliver materials associated with the Background IP Assets and IP Assets, (D.I. 19 at ¶¶ 56–59); (2) an obligation to deliver the Special IP to Plaintiff in a workable form, (*id.* at ¶¶ 62–63); and (3) an obligation to "maintain [Defendant's] TRV Flight Agreement with CASIS[,]" (*id.* at ¶¶ 60-61). The third of these—that relating to the obligation to maintain the TRV Flight Agreement with CASIS—is the only one as to which Plaintiff makes a substantive argument against dismissal of Count II. (D.I. 27 at 15–16) For that reason, the Count (as it relates to the TRV Contract) could only survive as to the asserted CASIS-related implied obligation. Thus, that purported obligation is the only one the Court will further assess below.

Plaintiff asserts that the TRV Contract required Defendant "to request that CASIS cooperate with the transfer and assignment to [Plaintiff] of Defendant's rights under its 'TRV Flight Agreement' with CASIS. . . . [and] implied in that contractual requirement was

[Defendant's] obligation to maintain the viability of the Flight Agreement with CASIS[.]" (D.I. 27 at 15 (citing D.I. 19 at ¶¶ 34(c), 60–61)) The TRV Contract indicates that within 10 business days of the signing of the agreement, Defendant will request of CASIS that CASIS transfer Defendant's "[TRV Flight] Agreement with CASIS to [Plaintiff.]" (D.I. 22, ex. A at § 3.3) The contract further specifies that "[Defendant] will take all reasonable actions to ensure that CASIS agrees to said transfer of the Agreement between [Defendant] and CASIS to [Plaintiff]." (*Id.*) Exhibit C to the TRV Contract also contains language indicating that there would be an assignment from Defendant to Plaintiff (to be completed at a later date) of the TRV Flight Agreement. (*Id.*, ex. A at ex. C)

It seems fairly obvious that an unspoken (and unwritten) expected precursor to the transfer/assignment of rights regarding the TRV Flight Agreement from Defendant to Plaintiff was that the TRV Flight Agreement would be in effect at the time that transfer/assignment occurred. And so it seems plausible that if Defendant took some action to cause the end of the TRV Flight Agreement before transfer/assignment was effectuated—even if it did so many months after the TRV Contract was signed—that could amount to a violation of an implied contractual obligation. And here, that is what the FAC alleges: that in June 2016, with the transfer/assignment still not complete, Defendant cancelled the TRV Flight Agreement, causing Plaintiff to lose its "flight opportunity with CASIS[.]" (D.I. 19 at ¶¶ 34(c), 60) Thus, Plaintiff pleaded the existence of a specific (implied) contractual obligation (that Defendant should not cause the termination of the TRV Flight Agreement prior to its transfer/assignment), a breach of that obligation by Defendant, and resulting damage to Plaintiff—each of the elements required to state a claim of a breach of the covenant of good faith and fair dealing.

Defendant, for its part, asserts that if Plaintiff "had wanted to include a provision that [Defendant] maintain its TRV Flight Agreement with CASIS so it could be transferred to [Plaintiff], it could have done so[,]" and that Plaintiff "cannot suggest that, in hindsight, it should have included such a provision in the parties' negotiations but did not." (D.I. 22 at 16) But the same could be said with regard to any claim allegedly implicating the covenant of good faith and fair dealing. The whole point of the doctrine is that there *can* be at least some circumstances wherein a provision is not explicitly found in a contract, but when it is reasonable that such a "gap" should nevertheless be filled in by law. And Defendant does not say anything about why the *particular circumstances referenced in the FAC* are such that it is implausible that such a gap existed here.

### 3. Conclusion

Therefore, Plaintiff has pleaded facts sufficient to support a claim for the breach of the covenant of good faith and fair dealing. The Court recommends that the District Court deny the motion with respect to Count II, to the extent that Count II relates to this purported breach of the covenant regarding the TRV Contract.

### C. Unjust Enrichment (Count III)

Defendant argues that Plaintiff's "unjust enrichment claim fails because the claim: (1) is based on duties expressly addressed by contract; (2) is preempted by DUTSA;[6] and (3) fails to meet the required elements under Delaware law." (D.I. 22 at 13) The Court will address each of these arguments in turn.

### 1. Legal Standard

---

6    While the Court does not address Defendant's Motion with respect to the Count V (the DUTSA claim), for completeness, the Court will assess the DUTSA preemption arguments.

"Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (citation and internal quotation marks omitted). It is "an equitable remedy [that] requires: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law. *U.S. Bank Nat'l Ass'n v. Gunn*, Civ. No. 11-CV-1155-RGA, 2015 WL 4641611, at *5 (D. Del. Aug. 5, 2015) (citations and internal quotation marks omitted). As to the last element, "[o]f cardinal significance is whether a contract already governs the parties' relationship. In short, if there is a contract between the complaining party and the party alleged to have been enriched unjustly, then the contract remains 'the measure of [the] plaintiff's right.'" *MetCap Secs. LLC v. Pearl Senior Care, Inc.*, No. Civ.A. 2129-VCN, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007) (citing *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del. 1979)); *see also Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58 (Del. Ch. 2012), *Restatement (Third) of Restitution and Unjust Enrichment* § 2(2) (2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment."). In such a case, the "plaintiff's right" is defined by the contract, which offers "a remedy provided by law," thereby negating that element of an unjust enrichment claim. *Cf. MetCap Sec.*, 2007 WL 1498989, at *5–6 (assessing the elements of unjust enrichment when there was no contract between the parties).

## 2.    Duties Imposed by Express Contract

The Court first addresses Defendant's argument that the unjust enrichment claim fails because the claim is based on duties expressly addressed by the contracts at issue. (D.I. 22 at

13–14)

### a.     TRV Contract

With regard to the TRV Contract, Plaintiff responds to Defendant's argument for
dismissal by asserting that even if Defendant is right, and its unjust enrichment claim flows from
matters addressed by the TRV Contract, Federal Rule of Civil Procedure 8 would still permit it
to plead the unjust enrichment claim in this federal action. (D.I. 27 at 16–17)

Plaintiff is correct, of course, that because this is a federal case, Rule 8 (not Delaware
state law) applies to what can be pleaded. And it is also true that this Rule notes that "[a] party
may state as many separate claims or defenses as it has, regardless of consistency."
Fed. R. Civ. P. 8(d)(3); *see also Ind. Ents. Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d
1165, 1175 (3d Cir. 1997) (noting that Rule 8 "permits inconsistency in both legal and factual
allegations" and that "a court may not construe a plaintiff's first claim as an admission against
another alternative or inconsistent claim") (citations, internal quotation marks, and brackets
omitted). But here, one of the underlying *elements* of the Delaware law unjust enrichment claim
(as set out above) is that the plaintiff have no other legal remedy for its claim. And so if it was
clear, based on the facts alleged in a plaintiff's pleading, that the plaintiff *did* have an alternate
remedy—in the form of a breach of contract claim (e.g., in a case where there was no dispute
that a contract existed, and that this contract governed the relationship that allegedly gave rise to
the unjust enrichment claim)—then even under federal pleading standards, the plaintiff *would
not have sufficiently pleaded* all of the elements of an unjust enrichment claim. *See Resource
Ventures, Inc. v. Resources Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 439–40 (D. Del. 1999)
(ordering a Delaware state law unjust enrichment claim dismissed at the motion to dismiss stage,
in light of the fact that the plaintiff had alleged the existence of a valid contract that was

18

breached and that governed the obligations of the parties); *cf. Esprit Health, LLC v. Univ. of Delaware*, No. 1:13-CV-01385-RGA, 2013 WL 6773571, at *2–4 (D. Del. Dec. 19, 2013) (denying a motion to dismiss a Delaware state law unjust enrichment claim, where the plaintiff had also brought a breach of contract claim, because it "is not an undisputed fact that there was a contract" and so "this [motion to dismiss stage] is not the right time to force Plaintiff to choose amongst its theories.").

Here, neither party appears to dispute the existence or enforceability of the TRV Contract.[7] And with regard to the unjust enrichment claim, it is clear that all of the pleaded facts in Count III that do not have to do with the FSC do, in fact, clearly relate to a "relationship" between the parties that is governed by the TRV Contract. (D.I. 19 at ¶¶ 65–73; *see also id.* at ¶ 66 (asserting that Defendant has been enriched by utilizing certain monies "received from Plaintiff, not for the development and delivery of the IP Assets [and] Background Assets . . . *as contractually required* . . . and by integrating the IP Assets . . . into Defendant's own products and business operations *rather than satisfying its contractual obligations* . . .") (emphasis added); *id.* at ¶ 67 (asserting that Defendant was enriched by its conduct in marketing the TRV in a manner suggesting that the TRV was its product))[8] Thus, as to the theory in Count III relating to the TRV Contract, Plaintiff has not sufficiently pleaded the absence of a remedy provided by law. Therefore, the Court recommends that the District Court grant the Motion with

---

[7]     Indeed, in explaining why the unjust enrichment claim should survive this challenge by Defendant, Plaintiff focuses solely on the FSC (and does not mention the TRV Contract). (D.I. 27 at 17)

[8]     Section 3.2 of the TRV Contract includes a provision addressing the extent to which Defendant may advertise its role as the TRV designer on its website or in other public and private marketing materials. (D.I. 22, ex. A at § 3.2)

regard to the unjust enrichment claim as it pertains to the TRV Contract.

### b.    Flight Software Contract

In contrast, the existence of the FSC (or, at least, the particular type of FSC described by Plaintiff in the FAC) is, to some degree, in doubt. Even the FAC's allegations allow for some uncertainty on this score, where they note that this "contract" is not a single, unitary contract, and instead is "reflected in a series of documents and communications[.]" (D.I. 19 at ¶ 19) Indeed, although its is not technically part of the properly considered record on a Rule 12(b)(6) motion, it is at least worth noting that, in its Answer to the FAC, Defendant "admit[s] that a flight software contract is reflected in a series of documents and communications, but denie[s] that the documents referred to by ME constitute that contract[.]" (D.I. 23 at ¶ 19) Although Defendant goes on to "admit[] that the parties agreed that Intuitive Machines would develop and deliver certain lander software to Moon Express and that Moon Express would make a series of payments to Intuitive Machines for delivery of that software . . . [, Defendant] specifically denie[s] that [Plaintiff] was to make payments against achievement of specific performance milestones." (*Id.*)

The unjust enrichment claim touches on the FSC in those portions of Count III where Plaintiff asserts that Defendant has been enriched by collecting certain payments from Plaintiff—despite having not (as the FSC purportedly called for Defendant to do by now) provided Plaintiff with, *inter alia*, certain flight software. (*See, e.g.*, D.I. 19 at ¶ 19) And the above-referenced performance milestones are central to Plaintiff's allegations of breach of the FSC. (*Id.* at ¶¶ 18–23) Therefore, this very contract's scope/existence, at least as it relates to the inclusion of such milestones, is in some doubt (even in light of what is alleged in the FAC). Thus, it seems plausible that, in the end, Plaintiff's unjust enrichment claim might *not* end up

20

flowing out of a dispute governed by a valid, existing contract. Given that the FAC allows for sufficient doubts about the existence or enforceability of the particular type of asserted FSC, this precludes dismissal of the unjust enrichment claim at this stage of the proceedings. *See MIG Invs. LLC v. Aetrex Worldwide, Inc.*, 852 F. Supp. 2d 493, 513 (D. Del. 2012) (denying a motion to dismiss a Delaware state law unjust enrichment claim pleaded alongside a related breach of contract claim, where "there is at least some dispute concerning [that] contract, particularly with regard to the meaning of certain terms"); *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 533–34 (D. Del. 2008) (same); *see also Esprit Health, LLC*, 2013 WL 6773571, at *4.

### 3. DUTSA Preemption

Defendant next argues that Plaintiff's "claim for unjust enrichment is based on many of the same facts it relies on for" its claim under DUTSA (Count V) and is, therefore, "preempted and must be dismissed." (D.I. 22 at 14) The DUTSA recites, in relevant part that, "this chapter displaces conflicting tort, restitutionary and other law of this State providing civil remedies for misappropriation of a trade secret." 6 Del. C. § 2007(a). "[DUTSA] Section 2007 was intended to preserve a single tort cause of action under state law for misappropriation as defined in 6 Del. C. § 2001(2) and thus to eliminate other tort causes of action founded on allegations of trade secret misappropriation." *Ethypharm S.A. France v. Bentley Pharms., Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005) (internal quotation marks omitted) (citing *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 755 F. Supp. 635, 637 (D. Del. 1991)). "The 'displacement' contemplated by Section 2007 extends to . . . claims, . . . which are grounded in the same facts which purportedly support the [DUTSA] claim." *Savor, Inc. v. FMR Corp.*, No. 00C-10-249-JRS, 2001 WL 541484, at *4 (Del. Super. Ct. Apr. 24, 2001) This Court has explained that a common law claim is "'grounded in the same facts'" as a trade secret claim if the same facts are used to

21

"establish all the elements of both claims"; put another way, the two claims cannot be grounded in the same facts if "the success of the common law claim does not depend on the success of the trade secrets claim[.]" *Accenture Global Servs. GmbH v. Guidewire Software*, 631 F. Supp. 2d 504, 508 (D. Del. 2009) (citation omitted).[9]

One of the elements that Plaintiff would need to establish in order to make out a DUTSA claim, both parties agree, (D.I. 27 at 7; D.I. 22 at 18), is that Defendant "acquired" the trade secret at issue. *See Osco Motors Co., LLC v. Marine Acquisition Corp.*, C.A. No.: 13-868-RGA/MPT, 2014 WL 2875374, at *13 (D. Del. June 24, 2014) (citing 6 Del. Code § 2001); *Accenture Global Servs. GmbH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 662 (D. Del. 2008). The "trade secret" that appears to be most directly at issue in Count IV's DUTSA claim—as that claim relates to the FSC—is certain "Flight Software[,]" that Defendant was supposed to have developed and delivered to Plaintiff (but, according to Plaintiff, never did). (D.I. 19 at ¶¶ 23–24, 75, 78, 84) And in its briefing, Defendant argues that one of the reasons why Plaintiff's DUTSA claim would fail here is that Plaintiff "does not allege that . . . [Plaintiff's] trade secret was 'acquired' by [Defendant]." (D.I. 22 at 21 (emphasis in original))

Yet even if Defendant were correct on this score, and it never "acquired" the trade secret at issue (thus dooming the DUTSA claim relating to the FSC), this would not necessarily cause the unjust enrichment claim regarding the FSC to fail. (*See* D.I. 27 at 18) That is because

---

[9]     The Court assumes *arguendo* that the above-referenced state law regarding DUTSA preemption would, if implicated by the facts pleaded here, preclude Plaintiff from asserting tort claims in this federal action that are grounded in the same facts as its DUTSA claims. The Court notes that it has reason to question why, in light of the previously-cited requirements of Rule 8, that assumption is correct as a legal matter. *Cf. Alpha Pro Tech., Inc v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 445–46 (E.D. Pa. 2013). But the issue need not be further explored here, in light of the fact that the DUTSA preemption arguments are herein resolved in Plaintiff's favor on other grounds.

Plaintiff has pleaded: (1) an enrichment (e.g., monies paid to Defendant that Defendant used as working capital to develop and integrate the "Flight Software . . . into Defendant's own products and business operations" so that Defendant gained business and goodwill); (2) an impoverishment (Plaintiff's resulting loss of money, loss of business, and loss of goodwill); (3) a relationship between the enrichment and impoverishment (specifically that (1) and (2) arise out of the same transaction); (4) the absence of justification (that Defendant was obligated to deliver the flight software to Plaintiff, instead of keeping that software for its benefit, but Defendant failed to do so); and (5) the lack of adequate remedy at law. (D.I. 19 at ¶¶ 21–24, 66–71). None of these elements (and the facts pleaded that relate to them) appear to implicate the "acquisition" defense that Defendant asserts as a reason why the DUTSA claim will be unsuccessful.

Because a failure of the DUTSA claim does not necessarily lead to a failure of the unjust enrichment claim as to the FSC, therefore, the two claims may not necessarily be predicated on the same facts. And Defendant, in its sparse argument about DUTSA preemption relating to the FSC, (D.I. 22 at 14), did not do enough to explain why preemption was an inevitability here. Thus, Defendant has not demonstrated that DUTSA preempts this part of the unjust enrichment claim. *Accenture*, 631 F. Supp. 2d at 508–09.

### 4.    Sufficient Pleading of Facts Relating to the Elements of the Claim

Defendant lastly argues that Plaintiff has not sufficiently pleaded the elements of an unjust enrichment claim, because Defendant "[a]s discussed in Section IV.F.2.b. [of its brief] has valid and enforceable rights to the intellectual property at issue." (D.I. 22 at 15) But Section IV.F.2.b, in turn, has no specific argument regarding the FSC. All of that subsection's specific assertions instead relate to the TRV Contract, and to why, pursuant to the TRV Contract, Defendant has a license to certain intellectual property referenced in that agreement. (D.I. 22 at

24–26)

As discussed above, Plaintiff has sufficiently pleaded facts relating to the unjust enrichment claim, as that claim relates to the FSC.

### 5.    Conclusion

In sum, while the Court recommends the District Court grant the Motion as to Count III's unjust enrichment claim to the extent it relates to the TRV Contract, it also recommends that the Court deny the Motion as to the claim's allegations relating to the FSC.

### D.    Conversion (Count VI)

Defendant next seeks dismissal of Plaintiff's claim of conversion in Count VI. As with unjust enrichment, Defendant presents multiple arguments as to why Count VI's conversion claim should be dismissed: (1) the express contracts prevent recovery for conversion; (2) Plaintiff's DUTSA claim preempts the conversion claim; and (3) Plaintiff fails to sufficiently plead the elements of conversion. (D.I. 22 at 10) Having set out certain of the relevant legal principles as to these types of arguments in Section III.C. (or otherwise above), the Court addresses each of Defendant's arguments here briefly.

### 1.    Legal Standard

"Generally speaking, any distinct act of dominion wrongfully exerted over the property of another, in denial of his right, or inconsistent with it, is a conversion[.]" *Drug, Inc. v. Hunt*, 35 Del. 339, 354 (Del. 1933). To state a claim for conversion, a plaintiff must establish a property interest in the converted goods, the right to possess the goods, and damages. *J.C. Trading Ltd. v. Wal-Mart Stores, Inc.*, 947 F. Supp. 2d 449, 459 (D. Del. 2013); *Hurst v. City of Dover*, Civil Action No. 04-083 GMS, 2008 WL 2421468, at *4 (D. Del. June 16, 2008) (citing *Facciolo Constr. Co. v. Bank of Delaware*, 514 A.2d 413 (Del. 1986) (table decision)). With

certain cabined exceptions, a claim for conversion has traditionally been limited to tangible goods. *Khushaim*, 2016 WL 3594752, at *7.

### 2. Duties Imposed by Express Contract

#### a. TRV Contract

As to Defendant's first argument—that Plaintiff's conversion claim should fail because it "lacks any substantive allegation that [Defendant] violated a duty independent from the contract[s]" at issue—it is true, as Defendant notes, that under Delaware law "where a claim for conversion arises solely from a breach of contract, a plaintiff must allege that a defendant violated a legal duty independent from his contractually-imposed duties." *Id.* at *8. However, with regard to the TRV Contract-related allegations, as noted above, Rule 8 permits a party in federal court to plead as many separate claims as it has, regardless of consistency. Here, in the Court's view, so long as Plaintiff can plead facts in this federal case that sufficiently sets out why the *elements* of a claim of conversion are met, it has met its burden—even if, ultimately, pursuant to Delaware law, it may not be able to *recover* on both its breach of contract claims and its conversion claims. *Cf. Alpha Pro Tech., Inc v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 445–46 (E.D. Pa. 2013).

#### b. Flight Software Contract

As to the FSC, for the reasons noted above, it is not clear that the conversion claim here will be found to arise from a breach of the actual contract that is asserted in the FAC. For these reasons, this first argument cannot now win the day for Defendant.

### 3. DUTSA Preemption

Second, as to Defendant's argument regarding DUTSA preemption, as discussed above with respect to unjust enrichment in Section III.C.2., the Court will assume *arguendo* that at the

pleading stage, a common law "claim [for conversion] will be preempted if it is grounded in the same facts which purportedly support the [DUTSA] claim." *Ethypharm*, 388 F. Supp. 2d at 433 (citation and internal quotation marks omitted). Defendant argues that Plaintiff's "conversion claim is based upon the same facts as [its] trade secrets claim, [and that therefore,] it is preempted by the DUTSA." (D.I. 22 at 12)

With respect to the conversion claim, Plaintiff alleges additional facts not found in its misappropriation claims. For example, Plaintiff identifies that "[t]he IP Assets, Flight Software and associated products and services [the items that are said to have been wrongly converted] include tangible property." (D.I. 19 at ¶ 98) Examples of this "tangible property" are said to include "products and services associated with the IP Assets—such as the Morpheus-derived code; the Drop Test Article(s) due following drop test; and the test hardware, software and test beds developed with [Plaintiff's] funding[.]" (D.I. 27 at 18–19) Plaintiff contends that in light of its conversion-related allegations as to these types of property (which relate to both of the contracts at issue), it can establish a conversion claim "without establishing a trade secret violation." (*Id*. at 19)

The Court takes Plaintiff to mean that these articles are not amongst the articles that Plaintiff will allege to be "trade secrets" in this case. Assuming that is so, then the Court can see how a failure of the trade secret claim would not automatically lead to a failure of the conversion claim as it relates to such items. And so on that ground, the Court finds it inappropriate to dismiss the conversion claim as to both contracts at this stage of the proceedings.

### 4.     Sufficient Pleading of Facts Relating to the Elements of the Claim

With regard to Defendant's argument that Plaintiff has failed to sufficiently plead the elements of the offense, Defendant contends that: (1) it "has rights to the intellectual property

26

that is the subject of [Plaintiff's] claim, as clearly defined by the contracts upon which [Plaintiff] relies[,]" (D.I. 22 at 12), and (b) Plaintiff "readily admits it did not pay [Defendant] for all its work under the TRV and Flight Software Contracts . . . [and] has therefore failed to sufficiently allege that it ha[s] a property interest upon which to base its claim of conversion[,]" (*id.* at 12–13).

### a.     Defendant's Property Interest

The Court first turns to Defendant's claims that it clearly has a property interest in "intellectual property" arising out of both contracts. (*Id.*) There are no facts in the record that suggest that Defendant has any rights arising out of the FSC, and for that reason, Defendant's argument fails with respect to the FSC. As to the TRV Contract, Defendant's claim to a right in "intellectual property" would not address any claims for conversion as to items that do not amount to the intellectual property discussed in the contract (i.e., items that are not IP Assets or Background IP Assets). (D.I. 27 at 18–19; D.I. 19 at ¶ 98) Even if Defendant were to have a property interest in some of the allegedly converted items, Plaintiff's conversion claim should, at a minimum, survive as to the tangible property that is not this type of "intellectual property." Of course, the delineations between what constitute such items (and the scope and extent of Defendant's property interest arising out of the TRV Contract) is an inherently factual matter that cannot be resolved at this stage in the proceedings.

### b.     Plaintiff's Property Interest

The Court next turns to Defendant's assertion that Plaintiff does not have a property interest in the allegedly converted items, because Plaintiff (wrongly) failed to pay Defendant for its work under the contracts. (D.I. 22 at 12–13)

With respect to the FSC, Defendant points to paragraph 26 of the FAC for support, (D.I.

22 at 13)), but the cited paragraph asserts, to the contrary, that "Plaintiff is in compliance with its contractual obligations under the Flight Software Contract, and has not been obligated to make additional payments to Defendant[,]" (D.I. 19 at ¶ 26). Taking the facts in the FAC as true, then, Defendant's argument provides no basis to dismiss the conversion claim as to the FSC.

With respect to the TRV Contract, Defendant points to paragraph 35 of the FAC for support, (D.I. 22 at 12–13), and that paragraph states that "[a]s a result of Defendant's non-compliance with its contractual obligations, Plaintiff has been contractually entitled to withhold any further payments. Plaintiff elected to withhold payments for Defendant's November 2015 invoice of $241,000 and subsequent invoices[,]"[10] (*id.* at ¶ 35). Defendant asks the Court to draw the inference that this immediate non-payment of the November 2015 invoice terminates all of Plaintiff's rights in all of the items allegedly converted by Defendant. (D.I. 22 at 12–13) But as the allegations in paragraph 35 make clear on their face, Plaintiff has a different view of the effect of the withholding of such funds (in light of the other allegations in the FAC). (*See, e.g.*, D.I. 19 at ¶¶ 34(f), 37, 39) Taking Plaintiff's allegations as true, as the Court must here, Defendant's argument as to Plaintiff's lack of ownership interest is insufficient to warrant dismissal of this claim as it relates to the TRV Contract.

### 5.    Conclusion

In sum, the Court recommends the District Court deny the Motion as to Count VI's conversion claim with respect to both the TRV Contract and the FSC.

### E.    Injunctive Relief (Count VII)

Lastly, Defendant argues that Plaintiff's "Count" of injunctive relief set out in Count VII

---

[10]    In the following paragraph, Plaintiff states that it "made a good faith payment" of this $241,000 in January 2016. (D.I. 19 at ¶ 36)

of the FAC must be dismissed. (D.I. 22 at 28) The Court agrees, because injunctive relief "is a remedy, not a cause of action." *Birdman v. Office of the Governor*, 677 F.3d 167, 172 (3d Cir. 2012) (upholding district court's rejection of claim for an injunction when plaintiffs had asserted no underlying cause of action); *see also Patrick v. Eastern Specialty Fin., Inc.*, Civ. No. 13-2074, 2015 WL 834107, at *2 (D. Del. Feb. 24, 2015). Plaintiff has included a request for injunctive relief in its Prayer For Relief, (D.I. 19 at 30), and adding a separate "Count" to the FAC regarding injunctive relief is neither necessary or appropriate. *See Westway Holdings Corp. v. Tate & Lyle PLC*, Civil Action No. 08-cv-841, 2009 WL 1370940, at *8 (D. Del. May 13, 2009).

Therefore, the Court recommends that the District Court grant the Motion as it relates to Count VII in its entirety.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that the District Court GRANT-IN-PART and DENY-IN-PART the Motion. More specifically, the Court recommends that the District Court DENY the Motion as to Plaintiff's claims for breach of the covenant of good faith and fair dealing (Count II) as to the FSC and the TRV Contract. With respect to Plaintiff's claims for unjust enrichment (Count III), the Court recommends that the District Court DENY the Motion as to the FSC and GRANT the Motion as to the TRV Contract. With respect to Plaintiff's claims for conversion (Count VI), the Court recommends that the District Court DENY the Motion as to the FSC and the TRV Contract. And with respect to Plaintiff's claim for injunctive relief (Count VII), the Court recommends that the District Court GRANT the Motion.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections

within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: September 22, 2017

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE