# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MOON EXPRESS, INC., <br><br> Plaintiff, <br><br> v. <br><br> INTUITIVE MACHINES, LLC, <br><br> Defendant. | C.A. No. 16-344-LPS |

## MEMORANDUM ORDER

Having reviewed the briefing submitted by Plaintiff Moon Express, Inc. ("ME") and Defendant Intuitive Machines, LLC ("IM") regarding various disputes concerning contract interpretation and admission of evidence at the upcoming trial (*see* D.I. 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 137, 138), IT IS HEREBY ORDERED that:

1. The Court agrees with IM that Section 3.3 of the TRV Contract is ambiguous.[1] The parties dispute whether Section 3.3 requires IM to physically deliver tangible things (ME's position) or just to transfer ownership rights to intangible intellectual property (IM's position). This is a dispute that will require presentation of evidence at trial to resolve. The TRV Contract

---

[1] 3.3 **IP CONVEYANCE**. The *conveyance of title* by Seller [IM] to Buyer [ME] *of the IP Assets* shall occur within 7 days of signing the contract for all *background IP* and any *IP assets* that have been developed under this Agreement for which the payment has already been made. IP Assets will further be conveyed to Buyer as they are developed under statement of work in Schedule 1 and as Deliverables annotated in Schedule 2, List of Developed IP Assets.

(D.I. 126-1 at page 4 of 46 (emphasis added))

1

is not consistent in its use of terms relating to intellectual property, such as "IP Assets." The reference to "title," for which ME offers no explanation, renders Section 3.3 "fairly susceptible" to two or more reasonable interpretations. It is unclear how IM can convey title to background IP assets when the contract explicitly provides ME with only license rights to background IP. Nor does Section 3.3 include the term "data products." For these and other reasons, the Court disagrees with ME that the only reasonable construction of Section 3.3 is that IM was required to deliver any data products associated with Background IP within 7 days of signing the TRV Contract, as well as any tangible "assets of IP developed under this agreement for which payment [has] been made." (D.I. 126 at 3)

2. The Court agrees with ME that the term "Payments are due upon receipt of Invoice" in Schedule 3 is ambiguous. IM insists that "due upon receipt" "has only one reasonable interpretation – that payments were due when Moon Express received an invoice from IM." (D.I. 127 at 1; *id.* at 2 (requesting jury be instructed that term "unambiguously means that ME was required to make payment upon receipt of an invoice")) IM's interpretation fails to account for Section 2's proviso that "Buyer shall not be obligated to make any further advances on the dates set forth on Schedule 3 if the associated 'Milestone Prerequisite' set forth on Schedule 3 for such payments has not been achieved by Seller." (D.I. 126-1 at page 3 of 46) Also, as ME observes, "[s]ince it would be impossible for any company to pay an invoice immediately upon receiving it, the term must have some less restrictive meaning within the context of industry standards." (D.I. 128 at 3) Otherwise, "it is difficult to see how any buyer faced with an instantaneous payment obligation upon receipt of an invoice would not be in a state of continuous default." (*Id.* at 4) "Due upon receipt" is ambiguous because it is fairly

2

susceptible to more than one reasonable interpretation (whether payments are due immediately or within some unspecified reasonable time), and because it is ambiguous evidence of industry standard (if otherwise properly offered) will be admissible.

3. The Court agrees with IM that the term "TRVs" in Section 6 is unambiguous and applies only to the actual TRVs that were to be manufactured for ME. TRV is defined as the "certain terrestrial return vehicle capable of returning to any planetary body." (D.I. 126-1 at page 2 of 46) It does not refer to IM's website or to prototypes designed to be tested on earth, which are referred to separately in the contract. (*See, e.g.*, D.I. 126-1 at page 5 of 46) (Section 6.1: "Seller shall manufacture, sell, and deliver up to five (5) complete and mission-capable TRVs to Buyer together with any models, prototypes, and test vehicles.")

4. ME's objection to admission of DTX7, a spreadsheet containing monthly cost information for the TRV Contract period, is OVERRULED. The "*Pennypack* factors" do not favor exclusion of this important evidence, which is probative of whether IM materially breached the contract or, instead, did all or substantially all of the work the parties contemplated. The spreadsheet is further probative of whether ME is entitled to restitution and to whether IM is entitled to wind down costs (and the extent of those costs). Months ago, ME received in discovery the same data in quarterly, as opposed to monthly, form. IM represents that "the spreadsheet is merely more detail of what was provided to ME during discovery" (D.I. 130 at 1), and ME will be given an opportunity to test this assertion. Any prejudice to ME – particularly from only recently having been advised that IM is seeking $212,000 damages rather than just $70,000, seemingly due to IM's "oversight" (D.I. 130 at 2) – can be fairly ameliorated by providing ME an opportunity to take a deposition of the witness through whom DTX7 will be

3

offered into evidence, no later than 48 hours before that witness will testify at trial. The Court orders IM to make such witness available for such a deposition at a reasonable time and location of ME's choosing. There is no evidence of bad faith by IM and, with the Court's ruling today, there is no likelihood of IM's late disclosure disrupting trial.

5. ME's objection to admission of three lists of software (DTX11, DTX168, and DTX215) is OVERRULED. The evidence helps prove what IM developed for and delivered to ME, which is probative of whether IM breached its obligation to provide ME the software it was required to provide. Just because ME "does not dispute that any of these files were provided" (D.I. 137 at 1) does not mean that IM should be precluded from presenting evidence to prove what it considers a crucial aspect of its case. The concerns of Federal Rule of Evidence 403 – such as waste of time and risk of misleading or confusing the jury – do not substantially outweigh the significant probative value of the evidence. In particular, with respect to ME's issues as to the large size of the exhibits, the Court agrees with IM that "ME itself put at issue the size and number of the files produced, claiming that too few files were delivered and they should have added up to at least a terabyte." (D.I. 132 at 2) (internal quotation marks omitted) The Court sees no basis for ME's contention that admission of this evidence will unfairly prejudice ME. (*See* D.I. 137 at 2) ME will be free to argue, and to present its evidence, that the software provided to ME did not actually work for its intended purpose or was otherwise insufficiently complete.

6. ME's objection to admission of exhibits containing communications with ME's investors (DTX253, DTX272) is OVERRULED. The evidence is relevant. In IM's view, which the jury will be free to accept, these documents "contain numerous admissions by [ME CEO

Bob] Richards about core issues in this case " and "directly contradict positions ME has taken in this case." (D.I. 134 at 1) For example, the jury may reasonably find, as IM will ask it to, that these exhibits "undercut ME's claim for restitution damages, show that IM's alleged breaches of the TRV Contract were not material, and constitute evidence that ME backed out of the TRV Contract because of shareholder pressure about costs, not because IM supposedly breached." (D.I. 134 at 1-2) Given the proper purposes for this evidence, the Court is not persuaded that IM is instead offering these exhibits for the improper purpose of making ME, "and in particular CEO Bob Richards, look bad." (D.I. 133 at 2)

7. ME's objection to admission of exhibits containing settlement communications (DTX87, 92, 94, 95, 98, and 99) is OVERRULED WITHOUT PREJUDICE to renew at trial. On the present record, it is unclear whether the underlying discussions and references to "settlement" arose solely in the context of just "business" negotiations or, instead, in the context of "a claim which was disputed" for Rule 408 purposes. It is also unclear whether, even if ME's proposal embodied in the documents was an "offer of compromise" within the meaning of Rule 408, the exhibits are admissible for some other proper purpose. Should the parties continue to be unable to resolve their disputes with respect to this evidence, they should be prepared to argue the issue prior to jury selection on the first morning of trial.

Wilmington, Delaware
January 2, 2018

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT COURT