## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MOON EXPRESS, INC., | |
| Plaintiff, | C.A. No. 16-344-LPS |
| v. | |
| INTUITIVE MACHINES, LLC, | |
| Defendant. | |

R. Craig Martin, Ethan H. Townsend, DLA PIPER LLP (US), Wilmington, DE

Ilana H. Eisenstein, DLA PIPER LLP (US), Philadelphia, PA

Michael P. O'Day, DLA PIPER LLP (US), Baltimore, MD

Marc A. Silverman, DLA PIPER LLP (US), New York, NY

     Attorneys for Plaintiff Moon Express, Inc.

Oderah C. Nwaeze, DUANE MORRIS LLP, Wilmington, DE

David J. Wolfsohn, Kelly Huff, DUANE MORRIS LLP, Philadelphia, PA

     Attorneys for Defendant Intuitive Machines, LLC

---

## MEMORANDUM OPINION

October 15, 2018
Wilmington, Delaware



**STARK, U.S. District Judge:**

Pending before the Court are seven post-trial motions, three filed by Plaintiff Moon

Express Inc. ("Plaintiff" or "ME") and the remaining filed by Defendant Intuitive Machines, LLC

("Defendant" or "IM").

## BACKGROUND

This case involves a contractual dispute between ME and IM concerning two contracts:

the Flight Software ("FS") contract and the Terrestrial Return Vehicle ("TRV") contract. Both

ME and IM filed breach of contract and other claims against each other relating to those

contracts. (*See generally* D.I. 113) After a five-day trial,[1] a jury returned a verdict finding ME

liable for breach of both contracts and awarding IM damages of $1.25 million and $2.25 million

in equity of ME common stock with respect to the FS contract, plus $732,000 ($520,000 plus

$212,000 for "TRV wind down costs") with respect to the TRV contract. (*See* D.I. 151 at 3, 5)

The jury also found that ME prevented IM from performing its obligations under Phase A of the

FS contract, so the jury did not reach the question of whether IM breached the FS contract. (*See

id.* at 1-2) The jury further found that IM breached the TRV contract, but that IM's breach was

not material. (*See id.* at 4) The jury additionally found in favor of IM on ME's claim for breach

of the covenant of good faith and fair dealing with respect to the TRV contract. (*See id.* at 6)

The Court entered judgment on the jury verdict. (*See* D.I. 182) The judgment provided in

relevant part that the $2.25 million in equity awarded corresponded to 590,710 shares of ME

common stock, as ME proposed. (*See* D.I. 155)

Thereafter, both parties filed multiple post-trial motions. IM filed four motions: (i) a

---

[1]The trial transcript appears in the record as D.I. 183-87. All citations to the trial
transcript are in the format "Trial Tr." followed by the page number.

motion for attorneys' fees and costs under Fed. R. Civ. P. 54(d)(2) and section 11.15 of the TRV

contract (*see* D.I. 191, 200, 220, 226); (ii) a motion for pre-judgment and post-judgment interest

(*see* D.I. 193, 194, 207, 213); (iii) a motion to order ME to deliver 590,710 shares of ME

common stock to IM pursuant to Fed. R. Civ. P. 70 (*see* D.I. 198, 199, 211, 217); and (iv) a

motion to permit registration of judgment under 28 U.S.C. § 1963 (*see* D.I. 209, 210, 218, 222).

ME filed three motions: (i) a motion for a new trial under Fed. R. Civ. P. 59 (*see* D.I. 195, 196,

216, 223); (ii) a motion to stay judgment on issuance of 590,710 shares of ME common stock to

IM under Fed. R. Civ. P. 62(b) (*see* D.I. 211, 217, 219); and (iii) a motion to stay judgment of the

monetary award to IM under Fed. R. Civ. P. 62(b) (*see* D.I. 218, 222).  The Court heard oral

argument on all pending motions on July 30, 2018.  (*See* D.I. 234 ("Tr."))

## PLAINTIFF'S MOTION FOR A NEW TRIAL

ME seeks a new trial with respect to each of the two contracts in dispute.  ME presents

multiple arguments to support its motion.  The Court is not persuaded that the requested relief is

warranted on any ground.

### Legal Standards

ME moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a), which

provides in pertinent part:

> A new trial may be granted to all or any of the parties and on all or
> part of the issues in an action in which there has been a trial by
> jury, for any of the reasons for which new trials have heretofore
> been granted in actions at law in the courts of the United States.

Among the most common reasons for granting a new trial are: (1) the jury's verdict is

against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage

of justice; (2) newly discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. *See, e.g.*, *Forrest v. Beloit Corp.*, 424 F.3d 344, 351 (3d Cir. 2005); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 289-90 (1993); *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir. 1991); *Bohus v. Beloff*, 950 F.2d 919, 930 (3d Cir. 1991); *see also Zarow-Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584 (D.N.J. 1997).

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Darflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading*, 9 F.3d 282 (reviewing district court's grant or denial of new trial motion under deferential "abuse of discretion" standard). However, where the ground for a new trial is that the jury's verdict was against the great weight of the evidence, the Court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury. *See Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993).

Although the standard for grant of a new trial is less rigorous than the standard for grant of judgment as a matter of law – in that the Court need not view the evidence in the light most favorable to the verdict winner – a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352-53; *see also Price v. Del. Dep't of Corr.*, 40 F. Supp. 2d 544, 550 (D. Del. 1999).

**The FS Contract**

ME first seeks a new trial on IM's breach of contract claim with respect to the FS

contract. ME asserts three bases for a new trial: (i) the jury's finding that ME prevented IM from

performing its obligations under Phase A of the FS contract was against the great weight of the

evidence, (ii) the verdict form was "misleading and confusing" and suffered from plain errors,

and (iii) evidence of settlement communications was improperly admitted and prejudiced the

verdict. (*See* D.I. 196 at 2-3)

First, ME contends that "[o]ne of the most egregious errors at trial was the application of

the prevention doctrine to disguise [IM]'s deliberate breach" of the FS contract by failing to

deliver the software it had already developed. (D.I. 196 at 9) In ME's view, the "prevention

doctrine is patently inapplicable" where the "alleged preventing-party had 'no duty whatsoever'

to perform the condition that allegedly prevented performance," as was purportedly the case here.

(*Id.* at 9) ME insists it had no contractual duty to provide a lander vehicle with which IM could

perform a test, referred to as a "tethered test," using the relevant software, contrary to IM's claim

at trial that ME prevented IM from performing the contract by not producing to IM a test vehicle.

(*Id.* at 9-10)

IM responds that the jury's conclusion on this issue was "well supported by the trial

record." (D.I. 216 at 5) The Court agrees with IM. The record contains sufficient evidence from

which a reasonable jury could have found that ME prevented IM from performing its obligations

under the FS contract.

ME now argues that it had no obligation to provide a test vehicle to IM to perform the

tethered test, yet before the jury it argued that IM was obligated to perform the tethered test on a

test vehicle provided by ME before IM could expect to get paid for developing the software

under the contract. (*See* Trial Tr. at 158-60) (plaintiff's counsel explaining during opening

4

statement that IM demanded payment from ME even though Phase A of FS contract required IM to perform tethered test, which "never occurred") ME's post-trial about-face is striking.

More importantly, the jury heard testimony from Bob Richards, ME's Chief Executive Officer ("C.E.O."), that Phase A of the FS contract would be incomplete without a successful tethered test, which ME considered "a great milestone;" the tethered test would use a test vehicle provided by ME, and IM would not be entitled to payment unless a successful tethered test had been performed. (*See id.* at 238) (Bob Richards noting that "successful tether test as proposed would trigger the final $1.125 million payment . . . [and] it was great surprise to me that [IM's C.E.O.] Steve [Altemus] expected that payment had been triggered through a different milestone which I had not approved") The jury heard additional testimony from Bob Richards that ME never provided a test vehicle with which IM could perform the tethered test and it would have been impossible for IM to have delivered the software in the absence of a test vehicle. (*See id.* at 882; *see also id.* 879 (Bob Richards explaining that "[ME] didn't have the test vehicle completed, so there was no way this software could have been delivered")) The jury could have reasonably credited all of this evidence to conclude that ME prevented IM from fulfilling its obligations under the contract by not providing a test vehicle for IM to conduct the tethered test, a test which ME insisted was required under the contract before ME was obligated to pay IM for the requisite software.

It is noteworthy that the jury also heard Bob Richards testify that ME had no intention of providing a test vehicle because it was contemplating a new vehicle design and had decided that a tethered test was no longer suitable for testing IM's software. (*See id.* at 878-81) (Bob Richards explaining that after several months of internal preliminary design review, "it was

becoming very evident" that new micro-concept design for lunar lander "was likely a better way to go," so ME "did not have an intention of actually building another terrestrial test vehicle")

Furthermore, the jury could have reasonably given more weight to IM's evidence than to ME's evidence. IM presented testimony from Steven Altemus, IM's C.E.O., who negotiated the FS contract with Naveen Jain, ME's Chairman of the Board. However, ME chose not to provide testimony from Naveen Jain, or even to have him present in the courtroom, as IM pointed out during the closing argument (without objection). (*See id.* at 1010) (IM's counsel noting during closing argument: "Mr. Jain? Mr. Jain? Not in the courtroom, didn't show up. Think about that. Why didn't Mr. Jain show up? He was the guy that Mr. Altemus was negotiating both contracts. Didn't show up. All right. Anyway, Mr. Altemus's testimony is unrebutted.") ME provided no explanation to the jury for Mr. Jain's absence.[2]

While the jury was not compelled to credit all of IM's evidence, it was free to do so. In the Court's view, there was plainly sufficient evidence to support the jury's finding that ME prevented IM from performing the FS contract. The jury's finding was not against the great weight of the evidence.[3]

---

[2]In addition to IM's Altemus testifying that he negotiated the FS contract with Jain, ME's Richards testified that he, too, was in constant contact with Jain. (*See, e.g.*, Trial Tr. at 222-23, 233, 236, 244)

[3]None of ME's other arguments on this issue is meritorious. ME argues that IM admitted it developed the requisite software, yet failed to deliver the software in order to gain "negotiating leverage" over ME. (D.I. 196 at 10) ME further asserts that IM expressly assumed the risk that "'phasing' would be adjusted and changed to reflect the current state of development." (*Id.* at 11) However, as IM points out, the issue is not whether IM was prevented from developing the software or assumed the risk that phases to the contract were subject to change; rather, the issue is whether IM was prevented from testing the software in a tethered test using a test vehicle. (*See* D.I. 216 at 5) Again, there is substantial record evidence to support the jury's finding that IM was so prevented by ME.

6

ME next identifies three reasons why the "jury verdict form was misleading and biased." (D.I. 196 at 12) According to ME, the verdict form improperly: (i) began with the question regarding IM's prevention doctrine rather than ME's affirmative breach of contract claim; (ii) did not present the threshold question of whether any prevention was wrongful; and (iii) did not present the assumption of risk exception to the prevention doctrine. (*Id.*) For reasons including those provided by IM (*see* D.I. 216 at 6-10), the Court does not agree with ME.

The jury was instructed on both the prevention doctrine and the assumption of risk exception to the prevention doctrine. (D.I. 149 at 38) On the assumption of risk exception, the Court adopted the language proposed by ME. (*Compare* D.I. 143 at 53 *with* D.I. 149 at 38) Those instructions helped guide the jury through the verdict sheet, informing the jury that if it found "[ME] prevented [IM] from fulfilling its duties under the [FS] Contract or interfered with [IM]'s ability to perform its duties under the [FS] Contract, then you must find that [ME] breached the [FS] Contract and that [IM] was excused from performance." (D.I. 149 at 38) ME did not object to this part of the instructions. (*See* D.I. 146 at 50)

Nor has ME has challenged the jury's finding that "[ME] breached the [FS] Contract by informing [IM] that it would not make the second payment . . . under Phase A and not making the payment." (D.I. 151 at 3) In reaching this verdict, the jury is assumed to have faithfully followed the jury instructions. *See United States v. Zauber*, 857 F.2d 137, 154 (3d Cir. 1988) ("A jury is presumed to have acted rationally. We must assume that the jury followed the court's instructions and arrived at a verdict based on those instructions.").

The jury also heard evidence, which it was free to credit, that ME hindered IM from completing the contract by not providing IM a test vehicle with which to test IM's software in a

7

tethered test, as explained above. Furthermore, the Court adopted the identical language and

order of the starting question – "Question 1" – in the final verdict form that ME had at one point

proposed.[4] (*Compare* D.I. 148 at 1 *with* D.I. 150 at 1)  For all these reasons, ME has failed to

show that the Court committed errors of law that affected ME's substantial rights. *See Finch v.*

*Hercules, Inc.*, 941 F. Supp. 1395, 1414 (D. Del. 1996) (stating that on post-trial motions Court

must determine "whether an error was in fact committed" and, if so, "whether that error was so

prejudicial that denial of a new trial would be inconsistent with substantial justice") (internal

quotation marks and citation omitted).

ME also contends that the Court erred in admitting purported settlement communications

in contravention of Federal Rule of Evidence 408. (*See* D.I. 196 at 13-15)  IM responds that the

Court properly admitted the evidence at issue. (*See* D.I. 216 at 10-14)

The Court does not believe it erred or abused its discretion in admitting the disputed

evidence.[5] *See Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 528 (3d Cir. 1995)

("The facts of each case bear upon the trial court's exercise of discretion to apply the exclusion

[under Rule 408].").  All of the evidence of settlement communications about which ME

complains was admitted over ME's objection. (*See* Trial Tr. at 134-37)  ME has failed to

---

[4]ME later "reconsidered [its] position" and objected to the language and order of
questions in its own proposed verdict form, an objection the Court rejected. (Trial Tr. at 918-19)
The Court is not deeming Plaintiff's objection waived; it is only referencing ME's proposal as
evidence of the unlikelihood that the verdict form was so unfair to ME as to warrant (alone, or in
combination with other purported errors) a new trial.

[5]The Court had previously overruled without prejudice ME's pre-trial objection to
admitting this evidence. (*See* D.I. 139 at 5)  The Court then considered ME's renewed objection
on the first day of trial and concluded that ME did not meet its burden to show that this evidence
must be excluded under Rule 408. (*See* Trial Tr. at 134-37)  Even considering the entirety of the
trial record does not change the Court's conclusion.

provide any persuasive basis for the Court to reconsider its earlier decision.

Even if there were error in admitting the evidence, given the verdict (which was almost entirely for IM on every issue) "it is highly probable that the error did not affect the outcome of the case." *Goodman v. Pa. Turnpike Comm.*, 293 F.3d 655, 667 (3d Cir. 2002). Therefore, such error would not provide a meritorious basis for granting a new trial. *See also* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").

**The TRV Contract**

ME next seeks a new trial on IM's breach of contract claim with respect to the TRV contract. ME principally asserts two grounds for a new trial on this contract: the jury's finding that IM did not materially breach the TRV contract was against the great weight of the evidence,[6] and the evidence of IM's wind-down costs were improperly admitted and prejudiced the verdict, materially increasing the amount of damages awarded. (*See* D.I. 196 at 3) IM responds that there was substantial evidence to support the jury's finding. (D.I. 216 at 14) IM also contends that there was sufficient evidence to allow the Court to hold that IM's wind-down costs were direct damages rather than consequential damages. (*Id.* at 19-20)

A new trial is not warranted. There was sufficient evidence to support a reasonable jury's

---

[6]Relatedly, ME argues that it had no obligation to pay after IM's material breaches, and thus the jury's finding that ME breached the TRV contract was also against the great weight of the evidence. (*See* D.I. 196 at 18)

finding that while IM breached the TRV contract, the breach was not material. ME argues that

IM committed multiple material breaches by failing to deliver certain intellectual property ("IP")

assets and regulatory licenses needed to build and operate a space vehicle that could be delivered

to the International Space Station and return to Earth. (D.I. 196 at 3, 15-17) But, as IM points

out, the jury heard sufficient evidence, which it could have reasonably credited, to support a

finding that these purported breaches were not material to the contract. (D.I. 216 at 14-18)

(citing evidence)

The jury, for example, heard testimony from ME's own witnesses that there was no

express deadline to deliver certain IP assets (*see* Trial Tr. at 384-85, 389) and ME waited too

long to request those assets from IM (*see id.* at 372, 373, 517-18). The jury also heard testimony

that IM eventually satisfied ME's requests. (*See id.* at 536, 553, 669-70, 715, 787-88) The jury

further heard testimony that the regulatory licenses were not critical to fulfilling the contract

since ME could obtain the relevant licenses on its own and there were no express deadlines for

launching a vehicle into space. (*See id.* at 800-01, 884-85, 889) Furthermore, on these points the

jury could have credited the testimony of Steven Altemus, IM's C.E.O., who negotiated the TRV

contract with Naveen Jain, ME's Chairman of the Board, who did not testify during trial and,

therefore, did not contradict Altemus. (*See id.* at 1010) While the jury was not compelled to

credit all of this evidence, it was free to do so, meaning that the finding that IM did not materially

breach the TRV contract is not against the great weight of the evidence.

With respect to the wind-down costs, ME's criticisms do not provide a meritorious basis

for ordering a new trial. All of the pertinent evidence about which ME now complains was

admitted over ME's objection. (*See* D.I. 120 at 1-2) ME has not provided any persuasive basis

10

for the Court to reconsider its earlier decision.

In sum, ME has failed to show that the jury's verdict is against the clear weight of the evidence, there is newly-discovered evidence, there was improper conduct by an attorney, the jury's verdict was in any respect facially inconsistent, there was a miscarriage of justice, or the verdict shocks the conscience. *See Williamson*, 926 F.2d at 1352-53; *Zarow–Smith*, 953 F.Supp. at 584-85. Thus, ME's motion for a new trial is denied.[7]

## DEFENDANT'S MOTION FOR ATTORNEYS' FEES RELATED TO THE TRV CONTRACT

ME agrees that IM is entitled to reasonable attorneys' fees and costs for work related to the TRV contract. ME also does not argue that the total amount of attorneys' fees and costs incurred by IM for the entire case is unreasonable. The parties' sole dispute is centered on how much of this total amount should be apportioned for work related to the TRV contract. (*See* D.I. 220 at 7) IM argues the apportionment should be 75%, while ME argues it should be 25%.

"Trial courts have broad discretion in fixing the amount of attorney fees to be awarded and may consider a variety of factors." *Dow Chem. Canada Inc. v. HRD Corp.*, 2013 WL 3942052, at *1 (D. Del. July 29, 2013). "Where it is not reasonably possible to parse between which fees are recoverable fees from which are not, it is appropriate to award a ***reasoned*** fraction of the total fees incurred." *Id.* (emphasis added).

The Court must determine the percentage of the fees and costs incurred by IM that were for work related to the TRV contract. IM acknowledges "it is not possible to determine from the

---

[7]The Court has carefully reviewed each aspect of ME's motion for a new trial, the briefing the parties provided, and the other submissions relating to the motion. To the extent there are arguments and issues raised in the motion that are not expressly addressed in this Memorandum Opinion, the Court has determined that they do not require discussion.

billing descriptions the precise amount of time spent on litigating the issues involving the [FS] Contract as opposed to those involving the TRV Contract and its terms and conditions." (D.I. 200 at 14) IM's rationale for the 75% apportionment is that "the legal and factual issues involving the TRV Contract required at least three times as much attorney time and related expense as those involving the [FS] Contract, making a 25% deduction reasonable and conservative." (*Id.* at 17) ME counters that IM's purported evidence for apportionment is highly subjective, unsupported, and fails to show a reasoned fraction of the total fees incurred. (*See* D.I. 200 at 8-10) ME's rationale for the 25% apportionment is that "[t]he value of the TRV contract only represents 25% of the total value of both contracts." (*Id.* at 11)

The fee-shifting provision of the TRV contract, Section 11.15, allows IM to recover reasonable attorneys' fees and costs related to the enforcement of the TRV contract. (*See* D.I. 191-3, p. 17 of 33) As the billing records did not sufficiently differentiate between the hours spent on issues related to the TRV contract and those that were not, IM used the depositions taken in this case as a proxy to calculate the apportionment percentage. Based on review of all the deposition transcripts, IM estimated that 75% of its fees and costs are attributable, in whole or in part, to the TRV contract. IM filed a supporting declaration from its lead trial counsel, Mr. Wolfsohn, who supervised the case from the start. (*See generally* D.I. 202; *see also id.* ¶¶ 36-38) Furthermore, as IM argues, the pretrial evidentiary motions submitted by both parties, as well as ME's own listing of issues for trial in the pretrial order, supports IM's proffered apportionment percentage. (*See* D.I. 226 at 2, 4-6) The Courts finds Mr. Wolfsohn's declaration to be acceptable evidence supporting the reasonableness of IM's requested fees and expenses.

ME argues that IM should not recover more than 25% of its overall fees, but ME has not

submitted any evidence to rebut Mr. Wolfsohn's declaration.[8] ME's legal arguments do little to impact the Court's assessment of the actual evidence submitted by IM. *See Bell v. United Princeton Properties, Inc.*, 884 F.2d 713, 720 (3d Cir. 1989) ("[B]ecause statements made in briefs are not evidence of the facts asserted . . . district court, in counsel fee litigation, . . . with respect to factual issues . . . must be presented with evidence and must make findings based on the evidence."). Instead, ME argues that "[IM] fails to provide any competent evidence" to support its apportionment percentage. (D.I. 220 at 8) But the Court can and must consider attorney declarations, like the one provided by Mr. Wolfsohn, in deciding whether the requested fees and expenses are reasonable. *See Bell*, 884 F.2d at 720; *see also Audubon Eng'g Co. v. Int'l Procurement & Contracting Grp., LLC*, 2016 WL 1089677, at *2 (D. Del. Mar. 21, 2016) (finding attorney declaration to be suitable evidence to support reasonableness of attorneys' fees and costs request). Because ME has provided no contrary evidence to challenge Mr. Wolfsohn's declaration, and Mr. Wolfsohn's declaration does not appear to the Court to be at all unreasonable – indeed, it is consistent with the Court's view of the number and complexity of the issues relating solely or partially to the TRV contract – the Court concludes that a 75% apportionment is a reasoned fraction of the total fees incurred. Accordingly, ME shall pay IM the

---

[8]The Court also disagrees with ME that "an objective measure of apportionment demonstrates that [IM] could only recover, at most, 25% of its fees." (D.I. 220 at 1) According to ME, the FS and TRV contracts were worth $12 million and $4 million, respectively, so the TRV contract represents only 25% of the total value of both contracts. (*Id.* at 10-11) However, as IM points out, "ME's math is all wrong." (D.I. 226 at 9) IM sought only the unpaid amounts in Phase A of the FS contract, not the entire value of the FS contract. ME also ignores its own claim for breach of the TRV contract, which sought over $2 million, that IM had to defend. (*See* Trial Tr. at 990) (ME's counsel stating during closing argument: "That is what they're requesting on the TRV Contract, $2,092,598 on the TRV Contract. It's the return of the funds that they paid. They deserve their money back.")

requested attorneys' fees and costs incurred by IM related to the TRV contract.[9]

## DEFENDANT'S MOTION FOR PREJUDGMENT AND POSTJUDGMENT INTEREST

IM requests prejudgment interest at a rate of 7% running from September 1, 2015 on

$3,375,000 with respect to the FS contract and running from April 1, 2016 on $732,000 with

respect to the TRV contract. (D.I. 194 at 5) IM also requests postjudgment interest running at a

per diem amount of 0.005232% per day until the judgment is fully satisfied, and compounded

annually. (*Id.* at 7) ME counters that "[IM] has failed to support its proposed dates for

computing prejudgment interest, impermissibly seeks prejudgment interest on the jury's equity

award, and compounds those errors by seeking postjudgment interest on the same miscalculated

prejudgment interest award."[10] (D.I. 207 at 2) ME insists that the pre-judgment interest should

not begin until July 29, 2016, the date IM filed its counterclaims. (*Id.* at 3)

"Under Delaware law, a party is entitled to prejudgment interest when the amount of

damage is calculable, and such interest has been awarded in breach of contract cases." *Enzo Life*

*Scis., Inc. v. Adipogen Corp.*, 82 F. Supp. 3d 568, 607 (D. Del. 2015). If it is possible to

ascertain the date when the breach of contract occurred, then that date could be used as the date

from which pre-judgment interest is computed. *See id.*; *see also Orthophoenix, LLC v. Stryker*

---

[9]Mr. Wolfsohn submitted a supplemental declaration to take into account fees and costs incurred through February 2018. (*See* D.I. 203) As of that date, the total fees and costs requested amounts to $1,198,966.64. (*Id.* at 2)

[10]ME also argues that the purpose of awarding prejudgment interest, to allow for full compensation, is not met here because ME did not receive the "benefit of its bargain" under the contract as IM "*never*" delivered" the requisite software. (D.I. 207 at 2, 4) (emphasis in original) The Court disagrees. In any event, IM has represented that it is willing to deliver the software. (*See* Tr. at 59-60; *see also* Trial Tr. at 766 (IM's Altemus agreeing IM would be willing to deliver software to ME))

*Corp.*, 2017 WL 1197675, at *7 (D. Del. Mar. 28, 2017) ("The Court determines that prejudgment interest should begin to run on the date of . . . repudiation [of the agreement]"). If it is not possible to determine exactly when the breach occurred, then the date the complaint was filed may be used as the date from which prejudgment interest is computed. *See F.E. Myers Co. a Div. of McNeil Corp. v. Pipe Maint. Servs., Inc.*, 599 F. Supp. 697, 705 (D. Del. 1984).

Here, there is sufficient evidence to support the dates provided by IM for its interest calculations. (*See* D.I. 194 at 1-2) Had the contracts been performed as contemplated by the parties, IM would have most likely received payments from ME related to the FS contract on September 1, 2015, and related to the TRV contract on April 1, 2016.[11] (*See id.*; *see also id.* at 4-5)

The Court, however, agrees with ME that IM cannot recover prejudgment interest for the TRV wind-down costs. (*See* D.I. 207 at 5) These costs did not become due for payment at a specified date under the terms of TRV contract itself, but instead were incurred by IM as a result of ending the TRV contract. (*See id.*)

"When the contract does not specify an interest rate, 6 Del. Code § 2301(a) states that, the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge *as of the time from which interest is due*." *Enzo*, 82 F. Supp. 3d at 607 (internal quotation marks omitted; emphasis added). Here, neither the FS contract nor the TRV contract specifies an interest rate. Thus, the Court must apply the statutory interest rate "as of the time from which interest is due." *Id.* As ME does not dispute that the Delaware legal rate, defined in 6 Del. C.

---

[11] IM's proposed April 1, 2016 date is a conservative simplification, as the payments were actually owed a few months earlier. (*See* D.I. 194 at 5; D.I. 213 at 7)

§ 2301(a), is the appropriate interest rate here (*see* D.I. 207 at 2 n.1), the Court will use that rate. The Court has already determined that the prejudgment interest should begin to run on September 1, 2015 for the FS contract and on April 1, 2016 for the TRV contract. But IM uses an interest rate as of the date the judgment was entered (February 22, 2018), which evidently does not match the date from which interest is due. (*See* D.I. 194 at 4) The Federal Reserve discount rate as of September 1, 2015, was 0.75% and as of April 1, 2016, was 1%.[12] Hence, the Court will apply an interest rate of 5.75% for the FS contract and 6.00% for the TRV contract.

With respect to the FS contract, the Court agrees with ME that IM may only seek prejudgment interest on the monetary judgment of $1.125 million, not also on the jury's award of $2.25 million in ME common stock. (*See* D.I. 207 at 7-8) IM points to the purposes underlying the award of prejudgment interest as reasons for awarding prejudgment interest not only on the monetary award but also on the equity award and relies on two cases in support. (*See* D.I. 207 at 9-10) In *Moskowitz v. Mayor & Council of Wilmington*, 391 A.2d 209, 210 (Del. 1978), plaintiff appealed to recover interest from the City of Wilmington on a refund of excess property taxes paid. In *Brandywine Smyrna, Inc. v. Millennium Builders*, LLC, 34 A.3d 482, 484 (Del. 2011), plaintiffs, who owned an automobile dealership, appealed a trial judge's decision not to grant prejudgment interest on damages, including property damage, lost car sales, lost parts and service sales, and other expenses, that were awarded by the jury. While the court granted the party's request for prejudgment interest in both these cases, the prejudgment interest related to money

---

[12]*See* The Discount Rate - Archive,
https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20151013a1.pdf;
https://www.federalreserve.gov/newsevents/pressreleases/files/monetary20160524a1.pdf (last visited Oct. 14, 2018).

damages, not equity awards. *See Brandywine*, 34 A.3d at 487; *Moskowitz*, 391 A.2d at 210.

Hence, IM's request for prejudgment interest on the equity award is denied.

In sum, IM's request for prejudgment interest is granted on the monetary judgment of

$1.125 million at 5.75% interest running from September 1, 2015 with respect to the FS contract,

and on the monetary judgment of $520,000 at 6% interest rate running from April 1, 2016 with

respect to TRV contract, and is denied in all other respects.

IM also seeks postjudgment interest. *See* D.I. 194 at 6-7; *see also Skretvedt v. E.I.*

*DuPont De Nemours*, 372 F.3d 193, 216 (3d Cir. 2004); *Eaves v. Cty. of Cape May*, 239 F.3d

527, 534 (3d Cir. 2001). ME does not dispute that IM is entitled to postjudgment interest, but

instead disputes only the calculation of the postjudgment interest. (*See* D.I. 207 at 9) IM's

request for postjudgment interest is granted at a per diem amount of 0.005232% on the monetary

judgment and on the prejudgment interest and attorneys' fees and costs awarded by the Court,

until the judgment is fully satisfied, and compounded annually, and is denied in all other

respects.

### DEFENDANT'S MOTION TO PERMIT REGISTRATION OF JUDGMENT UNDER 28 U.S.C. § 1963

IM seeks an order permitting IM to register the judgment in other jurisdictions in which

ME may have assets. (D.I. 210 at 1) Under 28 U.S.C. § 1963, "[a] judgment in an action for the

recovery of money . . . entered in any . . . district court . . . may be registered by filing a certified

copy of the judgment in any other district . . . when the judgment has become final by appeal or

expiration of the time for appeal or when ordered by the court that entered the judgment for good

cause shown." The judgment here has not become final by appeal or expiration of the time for

appeal. Thus, the issue before the Court is whether IM has shown "good cause" to permit registration of the judgment in other relevant jurisdictions.

"The good cause requirement may be satisfied if the judgment debtor has substantial property in a foreign district and insufficient property in the rendering district to satisfy the judgment." *Schreiber v. Kellogg*, 839 F. Supp. 1157, 1162 (E.D. Pa. 1993); *see also Associated Bus. Tel. Sys. Corp. v. Greater Capital Corp.*, 128 F.R.D. 63, 68 (D.N.J. 1989). IM argues that ME has no assets in Delaware even though it is incorporated here. (*See* D.I. 210 at 2) According to IM, all of ME's operations, employees, and physical assets are in Florida, and ME has bank accounts in New York. (*Id.*) IM also argues that "the need for quick enforcement of the judgment is particularly acute because Moon Express apparently has no sources of revenue other than equity investors and has a history of defaulting on its obligations." (*Id.* at 4)

ME has not challenged any of IM's factual allegations. Instead ME has moved to stay the monetary award judgment until ME's motion for a new trial is resolved. ME contends that IM's motion to permit registration of judgment is premature because ME is in the process of obtaining a bond as "security," if the Court requires such a bond as a condition for granting the stay. (*See* D.I. 218 at 2-3)

However, at this point, the Court has now resolved ME's motion for a new trial and will also be denying ME's motion to stay the monetary award judgment. The Court has also previously granted IM's request for discovery in aid of execution of judgment. (*See* D.I. 232) Under these circumstances, the Court is persuaded that IM has shown good cause to permit registration of the judgment in other districts in which ME may has assets. ME does not contest IM's assertion that ME has insufficient assets in Delaware with which to satisfy the judgment

and that ME has substantial assets in other districts. Therefore, IM's motion to permit registration of judgment is granted.

## DEFENDANT'S MOTION TO ORDER PLAINTIFF TO DELIVER 590,710 SHARES OF PLAINTIFF COMMON STOCK TO DEFENDANT

IM requests an order compelling ME to deliver 590,710 shares of ME common stock to IM within three days, in accordance with the judgment entered on February 22, 2018, pursuant to Federal Rule of Civil Procedure 70.[13] (*See* D.I. 199 at 2)  ME does not dispute the applicability of Rule 70 or the case law relied upon by IM establishing that the Court has discretion to effectuate the judgment in a timely manner.  Instead, ME "simply asks the Court to . . . stay the issuance of common stock to [IM]" until the Court resolves ME's motion for a new trial.  (D.I. 211 at 4)  Because the Court has now resolved the motion for a new trial against ME, the Court will exercise its discretion to grant-in-part IM's motion.  ME shall deliver 590,710 shares of its common stock to IM within ten (10) days of issuance of this Order.

## PLAINTIFF'S MOTION TO STAY JUDGMENT ON ISSUANCE OF 590,710 SHARES OF COMMON STOCK AND MOTION TO STAY JUDGMENT OF MONETARY AWARD

Both of ME's motions to stay are predicated on the Court granting ME's motion for a new trial, which was pending at the time the stay motions were filed.  (*See* D.I. 211 at 4 ("With this motion to stay, Moon Express simply asks the Court to . . . stay the issuance of common stock to Intuitive Machines until the resolution of Moon Express' Rule 59 motion."); D.I. 218 at 2 ("As it did with its previous Motion to Stay, Moon Express asks the Court to . . . stay

_____

[13]IM also requests an order that ME be held in contempt if ME fails to comply and does not deliver the shares as ordered.  (*See* D.I. 199 at 2)  Such an order is unnecessary at this time as ME has not indicated an unwillingness to deliver the shares as requested by IM.  (*See generally* D.I. 211)

enforcement of the money judgment until resolution of Moon Express' motion for a new trial."))

Because the Court is denying ME's motion for a new trial under Fed. R. Civ. P. 59, the Court

will also deny ME's motion to stay judgment on issuance of 590,710 shares of common stock

and its motion to stay judgment of monetary award.

## CONCLUSION

An appropriate order will be entered.